IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NAJEH ABDALLAH, individually and on behalf of classes of similarly situated individuals, | )<br>)  Case No. 16-cv-3967<br>)<br>)  Judge Joan B. Gottschall |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| FEDEX CORPORATE SERVICES, INC., a Delaware corporation, HARTE HANKS, INC., a Delaware corporation, C3/CUSTOMERCONTACTCHANNELS, INC., a Florida corporation, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**MEMORANDUM OPINION AND ORDER**

If something is preventing a package shipped internationally from being delivered, defendant FedEx Corporate Services, Inc. ("FedEx"), or, as in this case, a contractor providing call center services, makes a "trace call" to the shipper.[1] Resp. to JSMF ¶ 12. As a result of a "glitch" in a FedEx database, agents of defendants Harte Hanks, Inc. ("Harte Hanks") and C3/Customercontactchannels, Inc. ("C3"), placed over 200 trace calls to plaintiff Najeh Abdallah's ("Abdallah") cell number between August 2015 and June 2016. *See* Resp. to JSMF ¶ 19; Resp. to SAF ¶¶ 2–6. Abdallah filed a two-count class action complaint against C3, FedEx, and Harte Hanks under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

---

[1] For the sake of brevity, the court refers to Defendants' Joint Local Rule 56.1(a)(3) statement of material facts as "JSMF" and to plaintiff's Local Rule 56.1(b)(3) statement of additional facts as "SAF." *See* JSMF, ECF No. 97; Resp. to JSMF, ECF No. 102; Resp. to SAF, ECF No. 115. Plaintiff's 11-paragraphs statement of additional facts begins on page 15 of his response to the JSMF. ECF No. 102 at 15.

1

The court has before it defendants' motion for summary judgment on both counts. Abdallah responded to the motion for summary judgment in part that he no longer wished to pursue Count I. He has filed a separate motion, which defendants oppose, seeking leave to amend his complaint to drop Count I.

## I. Background

### A. Facts

Most of the facts surrounding the making of the trace calls at issue here are undisputed. Abdallah registered his cell number with the national do-not-call database in 2006. Resp. to SAF ¶ 1. FedEx contracts with C3 and Harte Hanks to place trace calls to FedEx customers (among other services). Resp. to JSMF ¶ 12. C3 and Harte Hanks' trace agents use a software system called "One Source" operated by FedEx. Resp. to JSMF ¶ 16. FedEx customers provide the phone numbers in the "One Source" database when they use the company's services. *Id.* at ¶ 18. The trace call process begins when a C3 or Harte Hanks supervisor assigns a trace agent a package's tracking number. *Id.* at ¶ 16. The agent enters the tracking number into "One Source," and the system gives the agent a phone number to call. *Id.*

The trace agents who called Abdallah were trying to reach other FedEx customers. Resp. to JSMF ¶¶ 12, 15. An error in the "One Source" system (the exact origin of which is unclear) caused Abdallah's cell number to be "auto-populated into a phone number field for other FedEx customers whose packages were delayed in customs." Resp. to JSMF ¶ 19; *see also* Resp. to SAF ¶¶ 2–5 (undisputed that plaintiff received hundreds of trace calls).

### B. Procedural History

Defendants answered the first amended complaint in June 2016. ECF No. 17; *see also* 1st Am. Ans to 1st Am. Compl., ECF No. 21. The court adopted the parties' proposed discovery

schedule on August 10, 2016. ECF No. 22. The schedule required pleadings to be amended by December 1, 2016, and required discovery to be completed by May 4, 2017. *Id.* The court set additional deadlines and referred the case to the assigned magistrate judge for discovery supervision. *Id.*

One day before the deadline to amend pleadings, Abdallah sought leave to amend his complaint, which the court granted seven days later, ECF No. 31. The Second Amended Complaint ("SAC"), ECF No. 32, added C3 and Harte Hanks as defendants based on discovery showing that their representatives placed the calls at issue. *See* Mem. Supp. Mot. Leave File 2d Am. Compl. 1, 6, ECF No. 28. Like the prior complaints, the SAC's two counts allege distinct TCPA violations. Abdallah asserts in Count I that defendants called his cell phone without his prior express consent using an automated telephone dialing system ("auto dialer" or "ATDS"). *See* 47 U.S.C. §227(b)(1)(A)(iii); SAC ¶¶ 38–39. In Count II, Abdallah alleges that his cell phone number was on the national do not call registry, and defendants therefore violated 47 U.S.C. § 227(c)(5) by calling him to "solicit[ ] the purchase of various package disposition services from FedEx." SAC ¶ 43; *see also* SAC ¶¶ 42–46.

Almost two months after the SAC was filed, defendants moved to stay the case. ECF No. 45 (Jan. 26, 2017); *see also* Minute Entry, ECF No. 41 (Jan. 12, 2017) (setting briefing schedule on anticipated motion to stay). They argued that the case should be paused until the D.C. Circuit Court of Appeals ruled in *ACA International v. FCC.*, No. 15-1211, because they anticipated a ruling on the meaning of the word "capacity" in the TCPA's definition of an auto dialer. The TCPA defines the term "automated telephone dialing system" to mean "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1);

3

*see also Blow v. Bijora, Inc.*, 855 F.3d 793, 801 (7th Cir. 2017) (discussing FCC's history of interpreting this definition). In *ACA International*, several companies and trade associations challenged a 2015 FCC ruling "concluding that equipment's 'capacity' to dial random or sequential numbers is not limited to its 'present ability.'" *Blow*, 855 F.3d at 801 (quoting *In re Rules & Regs Implementing the TCPA*, 30 FCC Rcd. 7961, 7972 (2015)).

The magistrate judge granted the motion to stay on March 20, 2017. Order, ECF No. 60 (Gilbert, J.). He concluded that "[t]he D.C. Circuit's ruling in *ACA International*, though not binding, will provide this Court with valuable input on the merits of Plaintiff's ATDS claim and the permissible scope of discovery on that claim in this case." *Id.* at 2; *see also Blow*, 855 F.3d at 802–03 (noting that courts across the nation stayed TCPA cases pending *ACA International*). The parties agreed that the do-not-call claim in Count II would likely be unaffected by any ruling in *ACA International. Id.*

*ACA International* was decided on March 16, 2018. *ACA International v. F.C.C.*, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit rejected the FCC's interpretation of the word "capacity" in the TCPA's definition of an auto dialer. *Id.* at 695–700. The *ACA International* court reasoned that the FCC's interpretation of the word "capacity" would make virtually every smart phone an auto dialer because "essentially any smartphone, with the addition of software, can gain the statutorily enumerated features of an autodialer and thus function as an ATDS." *Id.* at 696. The court found it "untenable to construe the term 'capacity' in the statutory definition of an ATDS in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country." *Id.* at 698.

After the D.C. Circuit decided *ACA International*, the magistrate judge directed the parties to submit a proposed case management plan and entered a revised case management order on April 20, 2018, ECF No. 75. The order permitted approximately six months of fact and expert discovery relevant to: "(a) the type of equipment used to place the trace calls at issue, and (b) the nature of the trace calls made by Defendants." *Id.* at 1.

The parties completed limited discovery. Minute Entry, ECF No. 88 (Nov. 27, 2018). Defendants then filed their pending motion for summary judgment, and Abdallah responded by seeking leave to drop Count I, the auto dialer count, from his complaint.

## II. The "Auto Dialer" Claim

Abdallah first sought leave to drop the auto dialer claim in Count I after defendants moved for summary judgment on it.[2] He invoked Federal Rule of Civil Procedure 15(a)(2), which tells courts to "freely give leave [to amend a pleading] when justice so requires." The rule takes a liberal approach to allowing amendments. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015).

Because the December 1, 2017, deadline to amend pleadings has not been extended, Abdallah must demonstrate good cause to enlarge that deadline under the more demanding standard of Rule 16(b)(4). *Arrigo v. Link*, 836 F.3d 787, 797 (7th Cir. 2016); *Bell v. Taylor*, 827 F.3d 699, 706 (7th Cir. 2016); *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). While delay alone is rarely a sufficient reason to deny leave to amend under Rule 15(a)(2), *Arrigo*, 836 F.3d at 797 (citing *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004) (other citation omitted)), "the primary consideration for district courts [under Rule

---

[2] Plaintiff does not specify whether he intends to dismiss Count I with or without prejudice. The court infers from the cases plaintiff cites that he intends a with prejudice dismissal.

16(b)(4)] is the diligence of the party seeking amendment." *Alioto*, 651 F.3d at 720 (citing *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005)).

At the outset, the court finds it hard to understand what the parties perceive to be the difference between amending the complaint to drop Count I and proceeding to summary judgment. Defendants insist that Abdallah should not "be shielded" from the consequences of his decision to pursue Count I in the face of purportedly contrary discovery. Resp. Mot. Leave to File 3d Am. Compl. 3, ECF No. 113. But if Count I is dropped from the complaint, any judgment will still almost certainly bar Abdallah from bringing a second suit against defendants asserting a claim similar to Count I. Under the doctrine of res judicata, a judgment on the merits bars relitigation by the same parties of "not only those issues actually decided in the prior suit, but all other issues which could have been brought" here. *Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011) (quoting *Aaron v. Mahl*, 550 F.3d 659, 664 (7th Cir. 2008)).

But suppose leave to amend is denied. Based on the cases Abdallah cites in his reply brief, *see* ECF No. 117 at 3–4, he appears to concede that Count I should be dismissed either as moot or as abandoned. *See Beer v. Kellogg Sales Co.*, 2006 WL 1722335, at *1 n.1 (N.D. Iowa June 22, 2006) (dismissing claim at summary judgment because plaintiff conceded that it should be dismissed); *Mendrala v. Crown Mortg. Co.*, 1990 WL 129602, at *4 (N.D. Ill. Aug. 28, 1990) (denying motion for summary judgment as moot because the plaintiff voluntarily dismissed a count of the complaint). Indeed, Abdallah's failure to develop any argument against dismissing Count I in his summary judgment response is reason enough to grant the motion and dismiss Count I as abandoned. *See Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 653–54 (7th Cir. 2007); *Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003).

For all that appears, then, the result will be functionally the same no matter which procedural path is taken: a summary disposition of Count I that bars relitigation of the claim in any future suit between the same parties. The difference here may be more a matter of procedural metaphysics than practical. The court nevertheless applies Rule 16(b)(4). Because plaintiff does not adequately explain his delay in dropping Count I, the motion for leave to amend must be denied, and Count I must be dismissed as abandoned.

Defendants contend that Abdallah did not act diligently because their discovery responses dating to March 2017 should have alerted him to the need to drop Count I. *See* Resp. to Mot. Leave to File 3d Am. Compl. 2, ECF No. 113. They point to three discovery events: (1) partial interrogatory responses propounded in March 2017; (2) interrogatory answers they propounded in June 2018 and (3) the depositions of corporate representatives of C3 and Harte Hanks taken in October and November 2018. *See id.* at 2–3; *see also Deps.*, ECF No. 97-1, Ex. B-C.

The record refutes defendants' argument in part. When the magistrate judge stayed the case in March 2017 (the month defendants claim Abdallah should have dropped Count I), he found that the ruling in *ACA International* would provide guidance on the merits and for determining the course and scope of discovery on Count I. *See* Order 2, ECF No. 60. Clearly there was more work to do. Once the stay was lifted, the magistrate judge, in April 2018, authorized additional fact and expert discovery concerning the equipment used to place the trace calls at issue. *See* Case Mgmt. Order 1, ECF No. 75. Importantly, the parties, not the magistrate judge, proposed this limited discovery. *See id.* Given that proposal and the discovery that ensued, defendants' assertion that Abdallah had everything he needed to drop Count I a year earlier rings hollow.

7

Abdallah nevertheless falls short of the good cause standard because he does not explain why he did not act sooner during limited discovery. His lawyer represents generally in his motion for leave to amend that he decided to drop Count I "in light of the arguments and evidence only recently presented by Defendants' motion for summary judgment," but he does not discuss what specific evidence and legal argument he means. *See* Mem. Supp. Mot. for Leave to File 3d Am. Compl. 3–4, ECF No. 110. The reply similarly does not mention the period of limited discovery that commenced in April 2018. *See* ECF No. 117 at 1–5. Abdallah does not explain why he pressed Count I after the June 2018 interrogatory responses or why he did not drop Count I after taking depositions of Harte Hanks' corporate representatives in October and November 2018.

The court cannot assume that Abdallah acted with reasonable diligence. The Seventh Circuit has repeatedly affirmed denials of motions for leave to amend where the plaintiff offered an insufficient explanation for his delay. *See, e.g., Bell*, 827 F.3d at 706; *Alioto*, 651 F.3d at 720–21; *see also Arrigo*, 836 F.3d at 798 (finding in the absence of an adequate explanation that delay resulted from "a tactical litigation decision"); *Carroll v. Stryker Corp.*, 658 F.3d 675, 684 (7th Cir. 2011); *Trustmark*, 424 F.3d at 553. Rule 16(b) is intended in part to "prevent parties from delaying or procrastinating and to keep the case 'moving toward trial.'" *Alioto*, 651 F.3d at 720 (quoting 1983 Advisory Committee's Note to Fed. R. Civ. P. 16). Defendants specifically complain that they could have avoided the cost of preparing a motion for summary judgment on Count I had Abdallah dropped it earlier. Resp. 5, ECF No. 113. Abdallah has given the court no reason to think defendants are wrong or that he could not have with reasonable diligence spared defendants this expense.

Because Abdallah has not demonstrated good cause to extend the deadline to amend pleadings, the court denies his motion for leave to file a third amended complaint. Count I is dismissed at summary judgment as abandoned.[3]

### III. The Do-Not-Call Claim

Defendants move for a summary judgment on the do-not-call list claim in Count II. Consumers may opt into the national do-not-call registry, which "permits a citizen to erect a wall that no advertiser may penetrate without his acquiescence." *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 797 (7th Cir. 2006) (Williams, J., concurring) (quotation, dash, and internal citation omitted). The TCPA permits a person who "has received more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of the do-not-call list regulations to sue for actual or statutory damages. 47 U.S.C. § 227(c)(5) (2015). Defendant's summary judgment motion asks the court "to determine whether there is a genuine issue for trial;" the court does not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those

---

[3] On September 18, 2019, defendants notified, ECF No. 118, the court of a recent decision in this district applying the TCPA's definition of an auto dialer in the wake of ACCA International. See *Smith v. Premiere Dermatology Forefront Mgmt., LLC*, No. 17 C 3712, slip op. at 4–10 (N.D. Ill. Sept. 9, 2019). This court need not reach the questions raised in Smith because Count I must be dismissed as abandoned.

facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)). "The underlying substantive law governs whether a factual dispute is material: 'irrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248). To create a genuine dispute, the contradictory evidence of a fact must raise more than "[m]ere 'metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). With these standards in mind, the court explains the governing legal principles and then turns to the summary judgment evidence.

**A. Dual Purpose Calls**

It is undisputed that a database "glitch" resulted in the placing of hundreds calls to Abdallah. *See* Resp. to JSMF ¶ 19; Resp. to SAF ¶¶ 2–6. The calls were intended for other FedEx customers, and nothing in the record suggests that the trace agents knew that they were calling the wrong number. *See id.* All parties acknowledge that the trace calls serve a useful, even necessary purpose. The court considers it very unlikely that a trace call placed to the correct phone number could lead to TCPA liability. The TCPA allows solicitation calls to be placed with the called party's prior "express consent," which FedEx customers almost certainly provide when they ship a package. 47 U.S.C. § 227(b)(1)(A); *see also In re Rules and Regs. Implementing the Tel. Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1832 ¶ 4 (Feb. 15, 2012); *Payton v. Kale Realty, LLC*, 164 F.Supp.3d 1050, (1064–65 N.D. Ill. 2016). Defendants have not raised the consent issue, however. The scope of Abdallah's consent to receive calls intended for other customers may be in doubt. The court does not know. The motion for

summary judgment must be decided on the grounds the parties have litigated, namely whether the jury could find that the calls Abdallah received were "dual purpose" calls.

The precise question here is whether the calls placed to Abdallah's cell number meet the definition of a telephone solicitation call. *See* Mem. Supp. Mot. Summ. J. 6, ECF No. 96. The operative TCPA regulations say that "[n]o person or entity shall initiate any telephone solicitation" to a residential or wireless number if the number is registered on the do-not-call list. *See* 47 C.F.R. § 64.1200(c), (e). The TCPA and the regulations define the term "telephone solicitation" to mean "the [ ] initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."[4] 47 C.F.R. § 64.1200(f)(14); *see also* 47 U.S.C. § 227(a)(4) (TCPA definition of "telephone solicitation"). The crux of defendant's argument is that the trace calls at issue were not intended to encourage the purchase or rental of anything. Rather, the trace calls, according to defendants, were intended "to resolve a problem with delivering a package so it can be cleared through customs and delivered to its intended destination." Mem. Supp. Mot. Summ. J. 6.

Abdallah argues, and defendants apparently concede, *see id.* at 8, that a 2003 FCC ruling ("2003 ruling") discussing "dual purpose" calls supplies the rule of decision here. The 2003 FCC ruling elaborated on whether and in what circumstances a "dual purpose call" counts as a telephone solicitation. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14098 ¶ 142 (July 3, 2003). Under the Hobbs

---

[4] The definition of "telephone solicitation" has three exceptions. Under the regulations, a call or message does not qualify as a telephone solicitation if it is (i) "[t]o any person with that person's prior express invitation or permission; (ii) "[t]o any person with whom the caller has an established business relationship;" or (iii) "[b]y or on behalf of a tax-exempt nonprofit organization." 47 C.F.R. § 64.1200(f)(14); *see also* 47 U.S.C. § 227(a)(4). No party here argues that these exceptions apply.

Act, 47 U.S.C. § 402(a), in the absence of a challenge to the 2003 FCC ruling in the appropriate federal court of appeals, the FCC's rulings interpreting the TCPA have "the force of law," so this court must follow them. *Blow*, 855 F.3d at 803 (citing *CE Design Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448–50 (7th Cir. 2010) and *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1308 (11th Cir. 2015)); *accord Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 737–38 (N.D. Ill. 2014) (applying the 2003 FCC ruling in TCPA suit). The FCC reasoned as follows:

> The so-called "dual purpose" calls described in the record—calls from mortgage brokers to their clients notifying them of lower interest rates, calls from phone companies to customers regarding new calling plans, or calls from credit card companies offering overdraft protection to existing customers—would, in most instances, constitute "unsolicited advertisements," regardless of the customer service element to the call. The Commission explained in the *2002 Notice* that such messages may inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services. If the call is intended to offer property, goods, or services for sale either during the call, or in the future (such as in response to a message that provides a toll-free number), that call is an advertisement.

2003 FCC ruling, 18 FCC Rcd. 14014, 14098 ¶ 142 (quoted in *Toney*, 75 F. Supp. 3d at 737).

### B. Genuine Issues of Material Fact

It is common ground that one of the purposes of the trace calls Abdallah received was to get the package delivered to its intended destination. *See* Resp. to JSMF ¶¶ 13–14. Abdallah argues that a reasonable jury could find that the trace calls he received were "dual purpose" calls intended to advertise or sell FedEx's return shipping services. The court agrees.

This much is undisputed. One of three things can happen as the result of a trace call: (1) delivery of the package by resolving the problem that is holding it up in customs; (2) return of the package to the shipper; or (3) destruction of the package. Resp. to JSMF ¶ 20 (undisputed portion). FedEx pays for return shipping if the delay is its fault. If the customer is responsible for the delay, the customer pays the cost of return shipping. *Id.* ¶ 25. FedEx charges the same

12

rates for return shipping as it does for shipping any package. *See* Resp. to SAF ¶ 10. By default FedEx offers to return ship packages at its cheapest, slowest, and lowest-margin shipping method. *See* Resp. to JSMF ¶ 24; Resp. to SAF ¶ 10. Nevertheless, nothing requires the customer to use the lowest-cost option. *See* Resp. to SAF ¶ 10.

1. *Whether Defendants Incentivize Agents For Return Shipments Is Genuinely Disputed*

Much of the summary judgment evidence concerns the profitability of the trace call program and the incentives, or lack of them, defendants have established for getting customers to select return shipping. Genuine disputes on both issues preclude summary judgment. Defendants emphasize the largely undisputed evidence concerning the lack of formal incentives they provide for getting customers to select the return shipping option.[5]

First, the record shows that, although the return shipments may be profitable in and of themselves, FedEx does not profit from the trace call program overall because the overhead costs of operating the call centers and administering the program exceeds any modest profits made from return shipments. Resp. to JSMF ¶ 31 (undisputed).

Even taken favorably to defendants (the opposite of the proper summary judgment perspective), these facts do not in and of themselves disqualify trace calls from being telephone solicitations. The FCC has specifically concluded that even "messages that promote goods or services at no cost are nevertheless unsolicited advertisements because they describe the "quality of any property, goods or services." *In the Matter of Rules and Regulations Implementing the*

---

[5] Defendants attached a new exhibit to their reply supporting their motion for summary judgment, the supplemental declaration of Paul Pulse, ECF No. 114-1. Defendants did not seek leave to file Pulse's supplemental affidavit. Considering facts injected into summary judgment proceedings at the reply stage "raises important fairness concerns." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). By waiting until the reply stage, defendants deprived plaintiff of the opportunity to request further discovery, to challenge the supplemental affidavit on its own terms, or to cite evidence in response to the supplemental affidavit. *See id.* The court therefore exercises its discretion to disregard Pulse's supplemental affidavit and the portions of defendants' reply that rely on it. *See id.* at 636; *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 604–05 (7th Cir. 1999); *Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989).

*TCPA*, 20 FCC Rcd. 3788, 3804 ¶ 39 (Feb. 18, 2005). Taking a common sense approach to the issue, the FCC concluded that the calls placed to inform recipients of free opportunity to learn about timeshares were solicitations despite the fact the learning opportunities were free. *Id.* Under similar reasoning, the trace calls here can be found to be telephone solicitations even though FedEx deems the trace call program unprofitable in the aggregate.

Defendants also point to undisputed evidence concerning how trace call agents are evaluated and how C3 and Harte Hanks are paid. None of the defendants track the number of trace calls that result in return shipments. Resp. to JSMF ¶ 27. FedEx does not pay or provide other incentives to C3, Harte Hanks, or their agents based on the number of packages returned. Resp. to JSMF ¶¶ 28–29.

Despite defendants' formal incentive structures, a reasonable jury could find that FedEx's system of evaluating trace agents indirectly places a premium on return shipments. FedEx does not evaluate Harte Hanks' agents based on the number of return shipments achieved. *See* Resp. to JSMF ¶¶ 30–31. However, agents are evaluated based on the number of calls they "return" to FedEx for further action each day. *See* Dep. of Paul Pulse 35:16-18, ECF No. 102-2, Ex. A. The jury could conclude that a customer who chooses return shipping chooses an attractive option for a trace call agent who must meet a quota of call returns each day; the other options potentially involve more complex, and therefore time-consuming, processes. It would therefore be reasonable to infer that FedEx's evaluation system coupled with its training incentivizes agents to push FedEx customers to choose the return shipping option.

    2. <u>Whether Trace Agents Are Trained Indirectly to Encourage Purchases Is Genuinely Disputed</u>

The Seventh Circuit has not applied the FCC's dual purpose framework. The court finds the Ninth Circuit's analysis in *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012),

14

instructive. The court in *Chesbro* held that automatic calls reminding customers that their points in a rewards program were about to expire were subject to the TCPA because they "encouraged" the recipient to redeem the points, a process that required a visit to one of the defendant's stores. *Id.* Though the call appeared to be a reminder call, the record showed that redeeming the points required the plaintiff to buy something from the defendant, so applying "a measure of common sense," the calls effectively encouraged future purchases. *Id.*

The summary judgment record here contains even more evidence from which a jury could find that the trace calls were intended in part to encourage the purchase of return shipping services. The calls in *Chesbro* never directly mentioned buying something from the defendant. Here, however, a jury could find from the disputed evidence that C3 and Harte Hanks' agents have been prepared to facilitate return shipment services when speaking with a FedEx customer and to mention the return shipping option on voicemail messages left for the customer. C3's corporate representative testified that C3 agents do not "directly offer return shipping services" when talking with FedEx customers. The customer must instead request them. Resp. to JSMF ¶ 21 (quoting deposition). FedEx's corporate representative, on the other hand, testified at his deposition that trace agents are "trained to mention return shipping or package destruction on all voicemails left if they are not able to reach a customer." Dep. of Paul Pulse 60:9-14, ECF No. 102-2, Ex. A. Like mentioning the expiration of points in the reminder calls in *Chesbro*, a reasonable jury could find that the purpose of training agents to remind customers of the return shipping option was indirectly to encourage them to purchase that service.

Defendants protest that it is undisputed that trace agents have enough training to provide "basic information" on rates, but the customer must be transferred to a FedEx representative to arrange the return shipment. *See* Resp. to JSMF ¶¶ 23, 26; Pulse Dep. 23:17-20 (agents

15

instructed to tell customers package "could be returned" to sender); *but see* Resp. to JSMF ¶ 22 (Harte Hanks representatives not specifically trained in depth on FedEx's rates). The fact that another FedEx representative must arrange for return shipping does not immunize the calls. A call need only "encourage[ ] [the recipient] to make future purchases;" the caller need not complete the sale or have the ability to do so. *Chesbro*, 735 F.3d at 918; *see also Toney*, 75 F. Supp. 3d at 745 (finding, at motion to dismiss stage, that calls placed to advertise another company's services were dual purpose calls).

      3. <u>Whether Trace Calls provide More than A "Collateral Opportunity" for Purchasing Is Genuinely Disputed</u>

Finally, defendants claim that any of the connection between the calls and the return shipping options is too attenuated to impose TCPA liability. Viewing the foregoing evidence and the voicemail messages discussed below in a light favorable to plaintiffs, a reasonable jury could find otherwise.

Defendants rely on a number of nonbinding cases generally holding that "communications that merely include collateral opportunities to purchase something from the caller do not constitute dual purpose messages where the opportunity to purchase something from the caller is too attenuated from the purpose of the initial communication." *Edelsberg v. Vroom, Inc.*, 2018 WL 1509135, at *6 (S.D. Fla. Mar. 27, 2018), appeal docketed No. 18-11317 (11th Cir. Sept. 16, 2019); *see also Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1067 (C.D. Cal. 2017); *Morris v. Unitedhealthcare Ins. Co.*, 2016 WL 7115973, at *12 (E.D. Tex. Nov. 8, 2016). *Vroom* receives the majority of defendants' attention, so the court considers it in depth. *See* Mem. Supp. Mot. Summ. J. 8–9.

The defendant, Vroom, Inc. ("Vroom"), bought and sold used cars. *Vroom,* 2018 WL 1509135, at *1. The plaintiff advertised his car online for sale, and Vroom sent him a text

16

message with a link to its website where he could complete an appraisal form Vroom used to decide whether to offer to buy a customer's car. *See id.* at *2, 5. The plaintiff argued that the text message was a dual purpose advertisement because it "included a link to Vroom's website and Vroom's overarching business model involves both the buying and selling of used cars." *Id.* at *4.

At summary judgment the *Vroom* court held that the sheer possibility that the plaintiff could be diverted into a purchase transaction on Vroom's website did not transform the messages into solicitations. *Id.* at *6. It distinguished a number of cases, including *Chesbro* and *Toney*, *supra*, because they "involved unsolicited advertising communications as compared to the message" at issue. *See id.* at *6; *see also Smith*, 228 F. Supp. 3d at 1067 ("The mere fact that parts of Blue Shield's website contains the capability of allowing consumers to engage in commerce does not transform any message including its homepage into telemarketing or advertising." (citation omitted)).

As the *Vroom* court's efforts to harmonize cases such as *Chesbro* and *Toney* demonstrates, the facts here are readily distinguishable.[6] The text message in *Vroom* pointed the recipient to Vroom's website without encouraging the plaintiff to purchase anything from Vroom or advertising anything the plaintiff could buy. *See Vroom*, 2018 WL 1509135, at *2. Here, in contrast, as explained above, the jury could conclude that trace agents are trained and incentivized to get customers to purchase return shipping services. Additionally, the jury could

---

[6] To cite another example, the nonbinding decision in *Alleman v. Yellowbook*, 2013 WL 4782217, *1 (S.D. Ill. Sept. 6, 2013), is distinguishable on its facts. The plaintiff there received phone calls confirming receipt of a free telephone directory. *Id.* at *6. The calls also stated that additional copies could be ordered but did not elaborate. *See id.* The court held at the complaint stage that the call did not qualify as a dual purpose call. *Id.* As explained in the text, the voicemail messages here not only mentioned return shipping service, but they invited the recipient to call to authorize those services. *See* Turin Decl. ¶¶ 9–10, ECF No. 102-1.

17

find that, unlike the text messages, the voicemail messages left for Abdallah by the trace agents expressly encouraged recipients to buy return shipping services.

The record contains transcripts of two voicemails left by trace agents for Abdallah on May 24 and 25, 2016.[7] The messages are substantially identical, so the first message follows:

> Hello, this is Raquel with FedEx International Trace Team. I'm calling regarding a package that was shipped to China with a tracking number 776162961490. The reason for our call is to inform you that the receiver has requested to leave the package and send the package back to you. So we need to know if you authorize and agree to have the package returned and agree to pay for the return fee using your FedEx account number. Please call us back as soon as possible to the phone number 1-800-247-4747. We need to have that information within the first 90 days of the package arrival at customs so that line will be on July 23rd. After that the package will be destroyed. Please call us back as soon as you can. The phone number is 1¬800-247-4747. Remember this option ends on July the 23rd. Thank you very much for shipping with FedEx. We appreciate your business. Please call us back.

Decl. of Eugene Turin ¶ 9, ECF No. 102-1 (voicemail left May 24, 2016); *see also id.* ¶ 10 (May 25, 2016, substantially the same); Resp. to SAF ¶ 9 (fact and contents of voicemail messages is not disputed). In a light favorable to Abdallah, the repetition of the deadline in this message and the threat of destruction can be found to be encouraging the return shipping option. Also, the message explicitly invites a purchase, inviting the customer to return the call and "authorize" payment for a return shipping service.

Taken together, the foregoing evidence permits a reasonable jury to find that the trace calls were "dual purpose" calls advertising or soliciting return shipping services. Although only two voicemails have been transcribed, the jury may reasonably infer that the other calls were similar. *See Toney*, 75 F. Supp. 3d at 746 (inferring purpose of first three calls plaintiff did not

---

[7] The transcription appears in the declaration of plaintiff's attorney. Counsel offers to provide a sound recording to the court upon request and avers that he shared a copy of the recordings with defendants' counsel. *See* Turin Decl. ¶ 9. Defendants do not object to the record evidence in its present form. *See* Resp. to SAF ¶ 9.

answer from what transpired on fourth call from same phone number). The court acknowledges defendants' arguments that the trace program focuses on getting a package to its destination, but there is evidence here that trace agents actively encouraged called parties to purchase return shipping services and that FedEx's evaluation system incentivized their behavior.[8] As in *Chesbro*, the fact that the trace call agents provided defendants with other options does not necessarily shield them from the TCPA. *See Chesbro*, 705 F.3d at 918; *Toney*, 75 F. Supp. 3d at 746.

## IV. Conclusion

For the reasons stated, plaintiff's motion for leave to file a third amended complaint is denied, and defendants' motion for summary judgment is granted in part and denied in part. Count I of the second amended complaint is dismissed.

Date:   September 18, 2019                          /s/
                                                    Joan B. Gottschall
                                                    United States District Judge

---

[8] Defendants cite several cases for the first time in their reply and make arguments not raised in their opening brief. *See* ECF No. 114 at 4–6. Arguments made for the first time in a reply must be deemed waived. *See United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 843 (7th Cir. 2018) (citing *Hess v. Reg–Ellen Mach. Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005)); *UIRC–GSA Holdings Inc. v. William Blair & Co.*, 289 F. Supp. 3d 852, 863 (N.D. Ill. 2018) (citation omitted). The court notes, however, that the district court cases cited by defendant are distinguishable for reasons similar to those given in the discussion of *Vroom* in the text. *See, e.g., Phan v. Agoda Co.*, 351 F. Supp. 3d 1257, 1262 (N.D. Cal. 2018) (text message confirming booking with travel website was not a dual purpose advertisement).